JM/SBK:WES/HLJ
F.#2009R02085

UNITED STATES DISTRICT COURT **M10- 800**
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- against -

GUSTAVE DRIVAS,
JONATHAN WAHL,
SERGEY V. SHELIKHOV,
IRINA SHELIKHOVA,
LEONID ZHELEZNYAKOV,
  also known as
  "LYONYA" and "LENNY,"
ELENA GIRENKO,
  also known as "LENA,"
KATHERINA KOSTIOCHENKO,
  also known as "KATYA," and
VERONYKHA TCHERNYTCHENKO,

           Defendants.
- - - - - - - - - - - - - - - - x

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF AN APPLICATION
FOR ARREST WARRANTS _ _ _
(T. 18, U.S.C., § 1349)

EASTERN DISTRICT OF NEW YORK, ss:

        CANDICE STEPHENSON, being duly sworn, deposes and says

that she is a Special Agent with the United States Department of

Health and Human Services, Office of the Inspector General ("HHS-

OIG").

        Upon information and belief, there is probable cause to

believe that in or about and between March 2005 and July 2010,

both dates being approximate and inclusive, within the Eastern

District of New York, the defendants GUSTAVE DRIVAS, JONATHAN

WAHL, SERGEY V. SHELIKHOV, IRINA SHELIKHOVA, LEONID ZHELEZNYAKOV,

also known as "LYONYA" and "LENNY," ELENA GIRENKO, also known as

"LENA," KATHERINA KOSTIOCHENKO, also known as "KATYA," and

VERONYKHA TCHERNYTCHENKO, together with others, did knowingly and willfully conspire to execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349)

The source of your affiant's information and the grounds for her belief are as follows:

I.  Qualifications and Sources of Information

1.  I have been an HHS-OIG Special Agent for approximately eight years.  During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations involving schemes to defraud Medicare, including schemes to bill for unnecessary treatment or services that were not provided.  Some of these schemes involved patients who agreed to undergo unnecessary treatment or to remain silent about bills to Medicare for services that were not provided, in exchange for cash kickbacks.  During the course of these investigations, I have interviewed witnesses, including patients, medical providers, and clinic employees; debriefed informants; reviewed recorded conversations; conducted physical surveillance; executed

2

search warrants; reviewed Medicare claims data, bank records, telephone records, patient charts, and other business records; and employed other investigative techniques. I am familiar with the records and documents maintained by health care providers, and I am familiar with the laws and regulations related to the administration of the Medicare program.

2.   I am assigned to one of the Health Care Fraud Prevention and Enforcement Action Strike Force ("Strike Force") teams, which is staffed with law enforcement agents and officers from the HHS-OIG and the Federal Bureau of Investigation ("FBI"), as well as state and local investigators from the New York State Office of the Attorney General, Medicaid Fraud Control Unit ("MFCU"), the New York Police Department ("NYPD"), and the New York City Human Resources Administration ("HRA"). The Strike Force is tasked with investigating Medicare and Medicaid fraud, and one of the priorities of my Strike Force team is investigating fraud in Medicare clinics serviced by patient transportation providers who are reimbursed by Medicaid.

3.   The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, members of the Strike Force, and from review of documents obtained by subpoena. In the portions of this affidavit that describe consensually recorded conversations, virtually all of the information, unless

3

otherwise indicated, is based upon my review of draft transcripts.[1]  In the portions of this affidavit that describe intercepted audio communications, virtually all of the information, unless otherwise indicated, is based upon my review of draft linesheets created by agents from the Federal Bureau of Investigation ("FBI") and other law enforcement agents assisting with this investigation.[2]

    4.  In this affidavit, I have described portions of certain conversations that were obtained through consensual recordings or intercepted during the course of court-authorized audio surveillance.[3]  I have not, however, summarized every pertinent consensually-recorded or intercepted conversation, nor have I included every pertinent part of any consensually-recorded or intercepted conversation that I have summarized.  Moreover, any transcripts of intercepted conversations are preliminary and in draft form.  As such, the summaries set forth in this

---

[1]    The participants in the consensually recorded conversations relied on in this affidavit spoke primarily in Russian.  For the purpose of preparing this affidavit, I relied on English translations of the conversations prepared by MFCU.

[2]    The participants in the intercepted communications relied on in this affidavit spoke primarily in Russian.  For the purpose of preparing this affidavit, I relied on English translations of the intercepted communications prepared by FBI translators who monitored the communications live.

[3]    Except where otherwise noted, all conversations described in this affidavit are set forth in part and in substance only.

affidavit are preliminary in nature. My opinions concerning the meaning of the conversations are based on my training and expertise developed as a result of investigating health care fraud schemes and based on facts learned during this investigation.

5. In this affidavit, I have identified certain individuals based on a review of intercepted oral and non-verbal, visual communications by members of the Strike Force. Unless otherwise indicated, the identifications of these individuals were made by statements in the oral communications that indicated the identity of the participants or through visual identification by agents familiar with the appearance of those individuals.

6. As set forth in the paragraphs below, there is probable cause to believe that the defendants are involved in a scheme to defraud Medicare by paying patients to agree to undertake unnecessary medical treatments, or billing Medicare for treatments that were never provided to the patients. Because I submit this affidavit for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth all facts known to me about this investigation.

II. The Medicare Program

At all times relevant to this complaint, unless otherwise indicated:

7. The Medicare program ("Medicare") was a federal

5

health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." The physician who provided a service to a beneficiary or ordered that a service be provided to a beneficiary was referred to as a "rendering physician."

8. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

9. Medicare was subdivided into multiple Parts. Medicare Part B covered the costs of physicians' services and outpatient care, such as physical therapy and diagnostic tests. Generally, Medicare Part B covered these costs if, among other requirements, they were medically necessary and ordered by a physician.

10. Medical providers that were certified to participate in Medicare, whether clinics or individuals, including physicians, were assigned a provider identification number ("PIN") for billing purposes. After a medical provider rendered a service, the provider used its PIN when submitting a claim for reimbursement to the Medicare contractor or carrier assigned to that provider's state.

6

11.  Medical providers were authorized to submit claims to Medicare only for services they actually rendered and were required to maintain patient records verifying the provision of services.

12.  To receive reimbursement from Medicare, a medical provider was required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92.  The claim included information identifying the medical provider, the rendering physician, the patient, and the services rendered.  By submitting the claim, the provider was certifying, among other things, that the services that were rendered to the patient were medically necessary.

13.  Medicare provider claims included "billing codes," which were numbers that referred to specific descriptions of medical services.  Medicare reimbursed medical providers a set fee for many billing codes.

14.  Medicare generally was required, by statute, to reimburse medical providers within 30 days of the receipt of a claim.

III.  The Medical Clinics

A.  Bay Medical Care PC

15.  Bay Medical Care PC ("Bay Medical") was a New York State corporation doing business in Brooklyn, New York.

Bay Medical was incorporated on March 14, 2005.  Bay Medical was
owned by defendant GUSTAVE DRIVAS.  DRIVAS was also the President
of Bay Medical.  Bay Medical was certified to participate in
Medicare on February 1, 2006.  On its Medicare enrollment
application ("application"), Bay Medical listed its original
place of business as 7612 Bay Parkway, Suite B, Brooklyn, New
York.  On or about July 15, 2009, Bay Medical relocated its place
of business to 8686 Bay Parkway, Brooklyn, New York (the "Bay
Parkway Office").

16.  On its application, Bay Medical indicated that it
would provide, among other things, physical therapy, nerve
conduction tests[4], Doppler echocardiography[5], and allergy
services to Medicare beneficiaries.  Bay Medical listed only one
doctor on its application, defendant GUSTAVE DRIVAS.   The
application also listed defendant IRINA SHELIKHOVA as an
individual who would be submitting claims on behalf of Bay
Medical, and defendant VERONYKHA TCHERNYTCHENKO as a
"Receptionist" for Bay Medical.

17.  On the Bay Medical application, defendant GUSTAVE
DRIVAS was the only individual who signed a certification as an

------

[4]    A "nerve conduction test" is designed to measure the
ability of nerves to send electrical signals.

[5]    A "Doppler echocardiography" uses ultrasound to measure
the flow of blood through the heart.

authorized official[6] that read, in part, "I will not knowingly
present or cause to be presented a false or fraudulent claim for
payment by Medicare, and will not submit claims with deliberate
ignorance or reckless disregard of their truth or falsity."

B.   SVS Wellcare Medical PLLC

18.   SVS Wellcare Medical PLLC ("SVS") was a New York
State corporation doing business in Brooklyn, New York.   SVS
filed for incorporation on April 24, 2006, and was incorporated
on March 24, 2008.   On the SVS application, defendant SERGEY
SHELIKHOV was the only individual listed as a "Director/Officer"
of SVS.   The application also listed defendant GUSTAVE DRIVAS as
a "Contracted Managing Employee" of SVS.   Both SHELIKHOV and
DRIVAS signed the application.

19.   SVS was certified to participate in Medicare on
April 24, 2006.   SVS listed its original place of business as
7616 Bay Parkway, 1st Floor, Brooklyn, New York.   SVS stopped
billing from that address on July 7, 2009.   On or about July 15,
2009, SVS relocated its place of business to the Bay Parkway
Office.

20.   On its Medicare enrollment application, SVS
indicated that it would provide, among other things, physical

---

[6]      An "authorized official" has the authority to bind the
medical provider, both legally and financially, to the
requirements of the Medicare program.   An authorized official
must also have an ownership or control interest in the medical
provider.

therapy, nerve conduction tests, vestibular function tests[7], allergy services, sleep studies, and vitamin infusions to Medicare beneficiaries.

21. Among the doctors listed on the SVS application were defendants GUSTAVE DRIVAS and JONATHAN WAHL. Both DRIVAS and WAHL indicated that they would be practicing at SVS by signing "Provider Background Questionnaires" that were submitted to Medicare. On the SVS application, defendant KATHERINA KOSTIOCHENKO, also known as "KATYA," was listed as an "Administrative Assistant."

C. SZS Medical Care PLLC

22. SZS Medical Care PLLC ("SZS") was a New York State corporation doing business in Brooklyn, New York. It was incorporated on February 12, 2008. Defendant GUSTAVE DRIVAS was listed on the application as the owner of SZS. On the application, DRIVAS signed as one of the authorized officials.[8] DRIVAS was also listed on the application as one of the individuals with an "Ownership Interest and/or Managing Control" of SZS.

23. SZS was certified to participate in Medicare on February 12, 2008. SZS listed its original place of business as

---

[7]    "Vestibular function tests" evaluate causes of certain symptoms such as dizziness or balance problems.

[8]    The other individual who signed as an authorized official is deceased.

10

7620 Bay Parkway, Brooklyn, New York. On or about July 15, 2009, SZS relocated its place of business to the Bay Parkway Office.

24. On its Medicare enrollment application, SZS indicated that it would provide, among other things, physical therapy, nerve conduction tests, vestibular function tests, allergy services, sleep studies, vitamin infusions, lab services, podiatry services, and urology services to Medicare beneficiaries.

25. Among the doctors listed on the SZS application were defendants GUSTAVE DRIVAS and JONATHAN WAHL. The application included a lease agreement between SZS and defendants IRINA SHELIKHOVA and ELENA GIRENKO, also known as "LENA," who signed as "landlords."

IV. The Fraudulent Scheme

26. As discussed in more detail below, the defendants and others employed by Bay Medical, SVS, and SZS paid cash kickbacks to Medicare beneficiaries to induce those beneficiaries to receive unnecessary physicians' services, physical therapy, and diagnostic tests. These kickbacks were paid to the beneficiaries in a room marked "PRIVATE" inside the Bay Parkway Office (the "Kickback Room"). The Kickback Room had a poster of a woman with her finger to her lips hanging on the wall opposite to the only door to the room, so that this poster directly faced anyone who entered. In bold letters at the bottom of the poster,

11

the words "DON'T GOSSIP" appeared in Russian.  See attached exhibit.

27.  As discussed in more detail below, the defendants and other employees of Bay Medical, SVS, and SZS also caused the submission of false and fraudulent claims to Medicare on behalf of Bay Medical, SVS, and SZS for services to Medicare beneficiaries that were not rendered and for services that were not medically necessary.

28.  Defendant GUSTAVE DRIVAS was a rendering physician at the Bay Parkway Office who prescribed medical services that were not necessary or were never provided.  DRIVAS was the rendering physician for numerous beneficiaries who received kickback payments in the Kickback Room.

29.  Defendant JONATHAN WAHL was a rendering physician at the Bay Parkway Office who prescribed medical services that were not necessary or were never provided.  WAHL was the rendering physician for numerous beneficiaries who received kickback payments in the Kickback Room.

30.  Defendant SERGEY V. SHELIKHOV controlled the sign-in sheet for co-conspirator beneficiaries who were to be paid cash kickbacks in the Kickback Room.  Among other things, SHELIKHOV told co-conspirator beneficiaries how many times they needed to visit the clinic to get on the kickback list. SHELIKHOV also directed co-conspirator beneficiaries to the

12

Kickback Room from a nearby waiting room.  SHELIKHOV reviewed patient charts inside the Kickback Room and brought money that was to be used to pay kickbacks into the Kickback Room.

31.  Defendant IRINA SHELIKHOVA was the only individual who was an authorized signatory on all three of the original Bay Medical, SVS, and SZS accounts into which Medicare reimbursed claims.  SHELIKHOVA used these accounts to generate the cash used to pay kickbacks to the co-conspirator beneficiaries in the Kickback Room by signing checks to a non-existent company, which were then cashed.

32.  Defendant LEONID ZHELEZNYAKOV, also known as "LYONYA" and "LENNY," controlled the sign-in sheet for co-conspirator beneficiaries who were to be paid cash kickbacks in the Kickback Room.  Among other things, ZHELEZNYAKOV told co-conspirator beneficiaries how many times they needed to visit the clinic to get on the kickback list.  ZHELEZNYAKOV also directed co-conspirator beneficiaries to the Kickback Room from a nearby waiting room.  ZHELEZNYAKOV also brought patient charts into the Kickback Room so that defendants ELENA GIRENKO, also known as "LENA," and KATHERINA KOSTIOCHENKO, also known as "KATYA," could determine the amounts of the kickbacks to be paid to co-conspirator beneficiaries.

33.  Defendant ELENA GIRENKO, also known as "LENA," brought money into the Kickback Room that she and defendant

13

KATHERINA KOSTIOCHENKO, also known as "KATYA," used to pay kickbacks. GIRENKO paid kickbacks to co-conspirator beneficiaries in the Kickback Room. Among other things, GIRENKO told co-conspirator beneficiaries what medical services they should be receiving and the amounts those beneficiaries would be paid in kickbacks for receiving those services.

34. Defendant KATHERINA KOSTIOCHENKO, also known as "KATYA," paid kickbacks to co-conspirator beneficiaries in the Kickback Room. Among other things, KOSTIOCHENKO told co-conspirator beneficiaries what medical services they should be receiving and the amounts those beneficiaries would be paid in kickbacks for receiving those services.

35. Defendant VERONYKHA TCHERNYTCHENKO controlled all scheduling of patient appointments for medical services at the Bay Parkway Office. Among other things, TCHERNYTCHENKO told co-conspirator beneficiaries the medical tests they should take to receive additional kickbacks. TCHERNYTCHENKO brought patient charts into the Kickback Room so that defendants ELENA GIRENKO, also known as "LENA," and KATHERINA KOSTIOCHENKO, also known as "KATYA," could determine the amounts of the kickbacks to be paid to co-conspirator beneficiaries.

V. Probable Cause

A. Background

36. The Centers for Medicare and Medicaid Services

14

contracted with private organizations who were responsible for detecting fraud. The organization responsible for detecting fraud in Brooklyn, New York was SafeGuard Services ("SGS").

37. An analysis done by SGS in 2008 and 2009 discovered a pattern in which: (1) Bay Medical submitted claims for certain allergy services, including food allergy tests; (2) Medicare reviewed those claims and denied 100% of them instead of automatically reimbursing them,[9] on the basis that Bay Medical had supplied insufficient documentation to demonstrate the medical necessity of those services and the fact that Medicare did not reimburse for food allergy testing and treatment; (3) Bay Medical stopped submitting claims for those allergy services; (4) SVS then billed for those same allergy services; (5) Medicare reviewed those claims and denied them instead of automatically reimbursing them, on the basis that SVS had supplied insufficient documentation to demonstrate the medical necessity of those services and the fact that Medicare did not reimburse for food allergy testing and treatment; (6) SVS then stopped submitting claims for those allergy services; (7) SZS then billed Medicare for allergy services; (8) Medicare instituted a "pre-pay edit"; and (9) SZS stopped submitting claims for those allergy services.

_____

[9] This procedure is referred to as a "pre-pay edit," which allowed Medicare to avoid the 30-day reimbursement requirement referred to in paragraph 14 above, in instances where Medicare had evidence that bills may be fraudulent.

15

38.  Rendering physicians who submitted claims for allergy services included defendants GUSTAVE DRIVAS and JONATHAN WAHL.

39.  SGS referred this evidence to HHS-OIG, which opened an investigation of Bay Medical, SVS, and SZS in April 2009.

B.  Confidential Sources

40.  Undercover operations supervised by investigators from HHS-OIG and other investigators from agencies participating in the Strike Force began in November 2009 after Medicare and Medicaid cards were obtained for two confidential sources ("CS-1" and "CS-2") of proven reliability whose reported information in this investigation has repeatedly been corroborated by audio and video recordings and other sources of information.  The confidential sources were recruited by MFCU and paid per operation.  The confidential sources visited the Bay Parkway Office and consensually recorded every visit they made to the medical clinic.  Some of the consensual recordings are discussed below.

1.  Summary of Specific Fraudulent Billing Evidence
Obtained as a Result of Undercover Operations

41.  CS-1 visited the Bay Parkway Office on November 17, 2009.  SZS submitted a claim to Medicare seeking reimbursement for treatment of CS-1 in the amount of $149.77. The claim listed defendant JONATHAN WAHL as the rendering

16

physician and indicated that WAHL provided evaluation and management services to CS-1, and that CS-1 received a therapeutic procedure, manual therapies techniques, and therapeutic techniques.  CS-1 advised that, on that date, he or she had only his or her blood pressure checked and received only a massage around his or her neck and shoulders that lasted less than ten minutes and that did not qualify for reimbursement under the submitted billing codes.  CS-1 advised that he or she did not receive any services from WAHL on that date.  Medicare reimbursed SZS \$112.33 for this bill.

42.  CS-2 visited the Bay Parkway Office on December 9, 2009.  SZS submitted a claim to Medicare seeking reimbursement for treatment of CS-2 in the amount of \$890.39.  This claim indicated that CS-2 received treatment for needle electromyography in two extremities, two nerve conduction tests, and an "H-reflex" nerve test.  CS-2 advised that he or she did not receive any of those procedures.  Medicare reimbursed SZS \$594.42 for this bill.

43.  CS-2 visited the Bay Parkway Office on January 13, 2010.  SZS submitted a claim to Medicare seeking reimbursement for treatment of CS-2 in the amount of \$144.58.  This claim indicated that CS-2 received treatment for therapeutic procedures, massage, therapeutic activities, and ultrasound.  CS-2 received only an aqua-massage by a machine during this visit.

17

Medicare reimburses for aqua-massage performed in a pool; however, CS-2 did not receive the aqua-massage in a pool. Medicare reimbursed SZS $113.38 for this bill.

44. CS-2 received aqua-massage by a machine on three other dates at the Bay Parkway Office. CS-2 advised that none of these treatments were performed in a pool. SZS submitted claims to Medicare for reimbursement that falsely claimed that the aqua-massage treatments to CS-2 had occurred in a pool on January 26, 2010, January 28, 2010, and February 24, 2010.

> 2. Additional Evidence Obtained as a Result of Undercover Operations
>
>   a. CS-1

45. On November 12, 2009, CS-1 went to the Bay Medical Office. CS-1 was introduced to defendant JONATHAN WAHL, who spoke to CS-1 with the aid of a Russian translator. CS-1 had a short discussion of approximately 15 minutes with WAHL, during which CS-1 indicated that he or she had pain in his or her lower back, arms, and shoulders. WAHL wrote down information on a medical chart but did not ask any additional questions about CS-1's complaint or conduct any physical examination of CS-1. CS-1 then spoke to defendant VERONICA TCHERNYTCHENKO, who told CS-1 that WAHL had prescribed an MRI and physical therapy for the neck and lower back and a blood test. A review of the SZS claim to Medicare for this visit indicated that Medicare was billed for an evaluation and management service typically lasting 45 minutes

18

which required WAHL to take a comprehensive history, conduct a comprehensive examination, and make medical decisions of moderate complexity.[10]

46.   On December 10, 2009, CS-1 went to the Bay Medical Office. An unidentified patient ("UP-1") told CS-1 that patients were being called into the Kickback Room for short periods of time to receive payments for their treatments. A few minutes later, defendant LEONID ZHELEZNYAKOV, also known as "LYONYA" and "LENNY," called CS-1 into the Kickback Room. Inside the room, CS-1 met defendant ELENA GIRENKO, also known as "LENA." GIRENKO stated to CS-1 that he or she could receive kickback payments if he or she agreed to undergo particular medical tests, treatment, and procedures, or if he or she referred other patients to the clinic for treatment. Specifically, GIRENKO told CS-1 that he or she would receive $50 for a therapy test; $110 for a neurological test; $150 for a stress test; and $100 for a urological test. GIRENKO also told CS-1 that he or she would receive $150 for each person he or she referred to the clinic. GIRENKO then paid $175 to CS-1 for one prior visit with defendant JONATHAN WAHL and three prior massages at the Bay Parkway Office.

b.   CS-2

47.   On November 25, 2009, CS-2 went to the Bay Medical

---

[10]   Billing for evaluation and management services by physicians typically occurs in the 10, 20, 30, 45, or 60 minute ranges.

Office.  CS-2 was introduced to defendant JONATHAN WAHL, who
spoke to CS-2 with the aid of a Russian translator.  CS-2 had a
short discussion of approximately 15 minutes with WAHL, during
which CS-2 indicated that he or she had pain in his or her lower
back.  WAHL wrote down information on a medical chart but did not
ask any additional questions about CS-2's complaint or conduct
any physical examination of CS-1.  CS-2 then spoke to defendant
VERONICA TCHERNYTCHENKO, who told CS-1 that WAHL had prescribed a
blood test, an MRI of CS-2's lower waist, and physical therapy.
A review of the SZS claim to Medicare for this visit indicated
that Medicare was billed for an evaluation and management service
typically lasting 45 minutes which required WAHL to take a
comprehensive history, conduct a comprehensive examination, and
make medical decisions of moderate complexity.

48.  On December 23, 2009, CS-2 went to the Bay Parkway
Office.  After arrival, defendant SERGEY V. SHELIKHOV called CS-2
by name and led CS-2 to a massage room, where CS-2 had a massage
performed by another clinic employee.  Before leaving the clinic,
CS-2 asked SHELIKHOV how to get paid for his or her visits.
SHELIKHOV replied that CS-2 needed to have a minimum of six
visits to receive a kickback and that he or she needed to receive
both medical tests and physical therapy.  SHELIKHOV told CS-2 to
speak with defendant VERONYKHA TCHERNYTCHENKO at the front desk.
SHELIKHOV explained to CS-2 that TCHERNYTCHENKO would provide CS-

2 with a list of medical tests and explain the steps CS-2 needed to take to receive a kickback.

49.  On December 30, 2009, CS-2 went to the Bay Parkway Office.  CS-2 stated that on that date, he or she observed defendant LEONID ZHELEZNYAKOV, also known as "LYONYA" and "LENNY," writing down names on a list.  ZHELEZNYAKOV then asked CS-2 how many times CS-2 had visited the office.  ZHELEZNYAKOV told CS-2 that CS-2 needed more than four visits to get on the list.  Based on my training and experience and knowledge of the case, I believe that the list contained the names of patients to whom SZS owed kickbacks, and that ZHELEZNYAKOV told CS-2 that CS-2 needed to receive additional treatments before SZS would pay a kickback.  CS-2 subsequently spoke with an unidentified patient ("UP-2"), who told CS-2 that there were a large number of people on the list waiting for money because the clinic had not given out money for the past two days.  In addition, another unidentified patient ("UP-3") told CS-2 that the clinic gives money every two weeks and that UP-3 receives $50 for every visit.

50.  On December 16, 2009, CS-2 used the referral from defendant JONATHAN WAHL to schedule an MRI test at a medical testing facility.  CS-2 did not have the test on that date, but returned to the facility on January 6, 2010.  On that date, CS-2 received an MRI test.

51.  On January 13, 2010, CS-2 went to the Bay Parkway

21

Office.  CS-2 spoke with defendant VERONYKHA TCHERNYTCHENKO, who told CS-2 that CS-2 should sign in with defendant LEONID ZHELEZNYAKOV, also known as "LYONYA" and "LENNY," for money.  CS-2 then spoke with ZHELEZNYAKOV, who told CS-2 that ZHELEZNYAKOV would take care of it.  TCHERNYTCHENKO then accompanied CS-2 to the Kickback Room and handed defendant ELENA GIRENKO, also known as "LENA," who was in the room, CS-2's medical chart.  GIRENKO then told CS-2 that he or she was eligible to receive $280 for all of CS-2's visits and tests to date, including the MRI test that CS-2 told GIRENKO he or she had received on January 13, 2010.  GIRENKO then paid $280 to CS-2.  GIRENKO then told CS-2 that he or she should take a head-dizziness test and he or she would receive $80, and that he or she should take five types of sonograms and that he or she would receive $30 per sonogram.  CS-2 observed GIRENKO writing the names of these tests on the inside cover of the medical chart that TCHERNYTCHENKO had handed to GIRENKO.  GIRENKO then told CS-2 that TCHERNYTCHENKO would prescribe the tests for CS-2, and that GIRENKO was writing the information down for TCHERNYTCHENKO.

52.  On March 25, 2010, CS-2 went to the Bay Parkway Office.  CS-2 received a massage.  After receiving the massage, CS-2 approached defendant LEONID ZHELEZNYAKOV, also known as "LYONYA" and "LENNY," who was standing in front of the door to the Kickback Room, and asked to be placed on the waiting list to

22

receive money. Later that day, ZHELEZNYAKOV told CS-2 and two unidentified patients ("UP-4" and "UP-5") to line up in front of the door to the Kickback Room. ZHELEZNYAKOV then handed a clipboard to defendant SERGEY V. SHELIKHOV. When CS-2 entered the Kickback Room, he or she spoke to defendant KATHERINA KOSTIOCHENKO, also known as "KATYA." KOSTIOCHENKO asked CS-2 his or her name, opened CS-2's medical chart, and told CS-2 that he or she had done four physical therapies. KOSTIOCHENKO then handed $200 to CS-2.

### c. Subsequent Physician Visits

53. Subsequent to their initial visits, neither CS-1 nor CS-2 was treated again by defendant JONATHAN WAHL or any other physician at the Bay Parkway Office.

### C. Court-Authorized Interceptions

54. On April 19, 2010, a United States District Judge in the Eastern District of New York signed orders authorizing the interception of oral communications and visual, non-verbal conduct and activities occurring within the Kickback Room. Audio and video recordings of interceptions commenced on April 26, 2010 and concluded on June 4, 2010 (the "Interception Period").

55. In total, the audio and video recordings establish that the defendants and other employees of Bay Medical, SVS, and SZS made approximately 1000 kickback payments totalling more than

23

$500,000[11] to Medicare beneficiaries during the Interception Period. The audio and video recordings further establish that a beneficiary typically entered the Kickback Room and stated his or her name. The beneficiary then typically had a conversation with either defendant ELENA GIRENKO, also known as "LENA," or defendant KATHERINA KOSTIOCHENKO, also known as "KATYA," during which GIRENKO or KOSTIOCHENKO reviewed the beneficiary's medical chart. Thereafter, GIRENKO or KOSTIOCHENKO then typically paid a cash kickback to the beneficiary, usually using only one hundred dollar bills. The beneficiary then typically exited the Kickback Room and another beneficiary was called into the room.

56. For example, on May 3, 2010, an unindicted co-conspirator beneficiary ("CCB-1") entered the Kickback Room and stated her name to defendant ELENA GIRENKO, also known as "LENA." CCB-1 stated that she had received $300 on the 12th, a Monday.[12] GIRENKO told CCB-1 that CCB-1 had seven massages remaining. GIRENKO handed $300 to CCB-1 for six massages. CCB-1 then asked GIRENKO if CCB-1 could take a test for vertigo, and GIRENKO told CCB-1 that she could. CCB-1 then left the Kickback Room.

---

[11] This figure was derived by first totalling the kickback payments where the amount was actually stated during the transactions in the Kickback Room. That sum was then multiplied by a factor that was based on the total number of kickback payments made divided by the number where the amount was actually stated.

[12] April 12, 2010 was a Monday.

24

57. Later on May 3, 2010, another beneficiary ("CCB-2") entered the Kickback Room and stated his name to defendant ELENA GIRENKO, also known as "LENA." GIRENKO reviewed medical records, and counted 18 massage sessions and a sonogram. GIRENKO then stated to CCB-2 that CCB-2 had two massage sessions left. GIRENKO counted a number of additional procedures, including a doctor's visit and a Holter Monitor[13]. GIRENKO then totaled a sum of $1370 and asked CCB-2 for $30 in change. GIRENKO then handed $1300 to CCB-2 and told CCB-2 that CCB-2 would receive $70 next time. CCB-2 then left the Kickback Room.

58. On May 7, 2010, a beneficiary ("CCB-3") entered the Kickback Room. Defendant KATHERINA KOSTIOCHENKO, also known as "KATYA," told CCB-3 that CCB-3 had received three massage sessions, a vertigo test, a visit to a cardiologist, and a sonogram. KOSTIOCHENKO confirmed the dates of the massage sessions and the date of the sonogram. KOSTIOCHENKO explained to CCB-3 that CCB-3 was receiving $295 based on a rate of $30 for the sonogram, $35 for the visit to the cardiologist, $50 for each massage session, and $80 for the vertigo test. CCB-3 then asked KOSTIOCHENKO which treatments would be worth $100, and KOSTIOCHENKO told CCB-3 that neurological tests were worth that amount. CCB-3 thanked KOSTIOCHENKO, took the cash payment, and

---

[13] A Holter Monitor is a machine which continuously records heart rhythms for 24 hours or more.

25

exited the Kickback Room.

59. On May 7, 2010, a beneficiary ("CCB-4") entered the Kickback Room and stated to defendant KATHERINA KOSTIOCHENKO, also known as "KATYA," that he had brought in two other patients, including one who had been going to a different clinic in Brooklyn. CCP-4 then asked KOSTIOCHENKO about payments he was supposed to receive for those referrals.

60. On May 10, 2010, a beneficiary ("CCB-5") entered the Kickback Room. CCB-5 told defendant KATHERINA KOSTIOCHENKO, also known as "KATYA," that he had not been to the clinic in over a year, but that he had received a massage session earlier that day. CCB-5 asked if money was given out only on Mondays, and KOSTIOCHENKO replied that money is given out Monday through Friday. KOSTIOCHENKO handed cash to CCB-5, who then left the Kickback Room.

61. On May 11, 2010, defendant ELENA GIRENKO, also known as "LENA," told a beneficiary ("CCB-6") that he would receive $150 for each patient he referred to the clinic. Later that day, another beneficiary ("CCB-7") told GIRENKO that CCB-7 had referred another patient to the clinic. GIRENKO told CCB-7 that CCB-7 should bring her chart to GIRENKO so that GIRENKO could record the referral.

62. On May 13, 2010, a patient ("CCB-8") entered the Kickback Room. Inside the room, CCB-8 told defendant ELENA

26

GIRENKO, also known as "LENA," that CCB-8 had a massage session
that day.  GIRENKO tallied a visit to a gynecologist and seven
massage sessions for CCB-8 with two doctor visits and six massage
sessions for the husband of CCB-8.  CCB-8 then reminded GIRENKO
that GIRENKO had promised to tell CCB-8 when a new procedure was
available.  GIRENKO told CCB-8 that a new test for the head and
new shots to be given by a pain management specialist were
available, and CCB-8 agreed to undergo both procedures.  GIRENKO
handed an undetermined amount of money to CCB-8.  CCB-8 then
exited the Kickback Room.

### D.   Analysis of Linesheets and Medicare Billing Records

63.  A list of beneficiaries who audibly stated both
their first and last names upon entering the Kickback Room[14]
during the 40 days of court-authorized interceptions was compared
to lists of patients for whom claims were submitted to Medicare
by SZS with either defendant GUSTAVE DRIVAS or defendant JONATHAN
WAHL indicated as the rendering physician.  According to this
comparison, approximately 16 beneficiaries for whom claims were
submitted to Medicare with DRIVAS as the rendering physician and
approximately 31 beneficiaries for whom claims were submitted to
Medicare with WAHL as the rendering physician received cash
kickbacks in the Kickback Room.

---

[14]   A small percentage of the beneficiaries entering the
Kickback Room audibly stated both their first and last names.

E.   Financial Analysis

    1.   Bay Medical

    64.   On April 1, 2005, a Bay Medical Care PC account was opened at JP Morgan Chase Bank under account number 907051162665 (the "Chase Bay Medical" account).  The authorized signatories on the account were defendants GUSTAVE DRIVAS and IRINA SHELIKHOVA.  Medicare reimbursements to Bay Medical were deposited into the Chase Bay Medical account.

    2.   SVS

    65.   On September 8, 2006, an SVS Wellcare Medical PLLC account was opened at JP Morgan Chase Bank under account number 907423538365 (the "Chase SVS" account).  The authorized signatories on the account were defendants SERGEY SHELIKHOV and IRINA SHELIKHOVA.  Medicare reimbursements to SVS were deposited into the Chase SVS account.

    3.   SZS

    66.   On February 29, 2008, an SZS Medical Care PLLC account was opened at JP Morgan Chase Bank under account number 750212888 (the "Chase SZS account").  One of the authorized signatories on the account was defendant IRINA SHELIKHOVA. Medicare reimbursements to SZS were deposited into the Chase SZS account.

    67.   Defendants GUSTAVE DRIVAS, JONATHAN WAHL, SERGEY V. SHELIKHOV, IRINA SHELIKHOVA, LEONID ZHELEZNYAKOV, also known

28

as "LYONYA" and "LENNY," ELENA GIRENKO, also known as "LENA," KATHERINA KOSTIOCHENKO, also known as "KATYA," and VERONYKHA TCHERNYTCHENKO all received checks from the Chase SZS account.[15] All of these checks were signed by either SHELIKHOV or SHELIKHOVA.

4. Cash Withdrawals

68. Numerous checks from the Chase SZS account were written to a company named "V & V Construction Solutions Corp." ("V & V") and signed by defendant IRINA SHELIKHOVA. The checks were endorsed on the back with the company name and cashed. The handwriting on the front and back of the checks was the same.

69. The checks to V & V were written several times per week and in round amounts. For example, during the week of July 12, 2009, defendant IRINA SHELIKHOVA wrote a check to V & V for $1000 on July 13, 2009; a check to V & V for $7500 on July 14, 2009, and a check to V & V for $5000 also on July 14, 2009. All three checks were cashed at the same check cashing facility. For another example, during the week of October 12, 2009, SHELIKHOVA wrote a check to V & V for $5000 on October 13, 2009; a check to V & V for $5000 on October 14, 2009; and a check to V & V for $5000 on October 16, 2009. All three checks were cashed at the same check cashing facility. During the period from July 9, 2009

---

[15]    SHELIKHOV and SHELIKHOVA wrote checks to "Wahl Medical PC" which were endorsed by defendant JONATHAN WAHL.

29

to November 30, 2009, SHELIKHOVA wrote a total of $233,550 in checks to V & V, all of which were cashed at that same check cashing facility.

70.   A review of public records and computer databases could not confirm the existence of V & V.

### 5.   Checks from SHELIKHOVA to GIRENKO

71.   Defendant IRINA SHELIKHOVA wrote numerous checks from the Chase SZS account to defendant ELENA GIRENKO, also known as "LENA," in round amounts.  For example, on July 1, 2009, SHELIKHOVA wrote a check to GIRENKO in the amount $10,000.  On July 8, 2009, SHELIKHOVA wrote a check to GIRENKO in the amount $14,000.  On July 13, 2009, SHELIKHOVA wrote a check to GIRENKO in the amount $24,000.  For the period July 1, 2009 to November 23, 2009, for example, SHELIKHOVA wrote a total of $303,000 in checks to GIRENKO from the Chase SZS account.

### 6.   Total Claims and Reimbursements

72.   From January 1, 2006 to May 31, 2010, Bay Medical, SVS, and SZS submitted claims to Medicare totalling $71,967,504.02.  Medicare reimbursed Bay Medical, SVS, and SZS a total $46,887,513.38.

## VI.   Conclusion

73.   Given the confidential nature of this continuing investigation, I respectfully request that this complaint and affidavit be maintained under seal until Friday, July 16, 2010 at

30

8:00 a.m. or until this court or another court of competent jurisdiction orders otherwise, except that Special Agents of the HHS-OIG and the FBI and other law enforcement officials working with them on this investigation may disclose this complaint and affidavit and the arrest warrants as necessary to effectuate the arrest and arraignment of the defendants.

WHEREFORE, your affiant respectfully requests that arrest warrants be issued for the defendants GUSTAVE DRIVAS, JONATHAN WAHL, SERGEY V. SHELIKHOV, IRINA SHELIKHOVA, LEONID ZHELEZNYAKOV, also known as "LYONYA" and "LENNY," ELENA GIRENKO, also known as "LENA," KATHERINA KOSTIOCHENKO, also known as "KATYA," and VERONYKHA TCHERNYTCHENKO, so that they may be dealt with according to law.

CANDICE STEPHENSON
Special Agent
HHS-OIG

Sworn to before me this
14th day of July, 2010

n
ge

31

БУДЬ НА ЧЕКУ,
В ТАКИЕ ДНИ
ПОДСЛУШИВАЮТ СТЕНЫ,
НЕДАЛЕКО ОТ БОЛТОВНИ
И СПЛЕТНИ
ДО ИЗМЕНЫ.

# НЕ БОЛТАЙ!